BARNES v. AMERICAN CAN COMPANY

(January 2, 1928. Opinion and Decree.)

*(Syllabus by the Court)*

1. **Louisiana Digest—Master and Servant —Par. 160 (j).**
Where plaintiff admits that the allegations of his petition as to total permanent disability to do work of any reasonable character are erroneous, and where the evidence shows that he has earned during the intervening three and one-half years since the accident, for the greater part of the time, as much as he earned before and there is no definite proof as to actual loss of time and wages by reason of the injury, the suit will be dismissed.

Appeal from Civil District Court, Division "C". Hon. E. K. Skinner, Judge.

Action by Marshall Barnes against American Can Company.

There was judgment for plaintiff and defendant appealed.

Judgment reversed.

J. Olin Chamberlain, of New Orleans, attorney for plaintiff, appellee.

John E. Jackson, of New Orleans, attorney for defendant, appellant.

JONES, J. This is a suit for the maximum amount of compensation, four hundred weeks at twenty dollars ($20.00) per week, a total of eight thousand dollars ($8000.00).

The petition, filed on October 14th, 1924, alleges as follows:

(1) Plaintiff, while employed as a millwright by defendant for forty-eight dollars ($48.00) per week, on October 14th, 1923, fell eight or nine feet from a scaffold, struck his right foot on a fly wheel, fractured and dislocated the bones thereof;

(2) He was treated without benefit by defendant's nurse at the plant for nine days and then on her advice consulted Dr. Nelson, physician of defendant, who after five weeks ineffectual treatment, had plaintiff secure an X-ray of the injured foot, which showed a fracture and two complete dislocations;

(3) Dr. Nelson then sent plaintiff to a bone specialist, Dr. McIlhenny, who advised, after four months' ineffectual effort, that the injured member be encased in a plaster cast for six months, but defendant then refused further medical treatment;

(4) His injury has steadily become more painful and he is totally disabled from working as a millwright for which he is exclusively and especially qualified, and such total disability will continue, unless a cure of his injury is effected by use of plaster cast;

(5) He is the sole support of six children and fears he may not be able to use his foot at all, if the plaster cast is used, and is, therefore, unwilling to hazard it;

(6) This injury, which was made known to the manager, chief engineer and time-keeper of defendant immediately thereafter, has produced a permanent total disability to do work of any reasonable character.

To this petition defendant filed an exception of no cause of action, which was overruled by the trial judge and is urgently pressed here. As we have reached the conclusion that plaintiff has failed to make out his case for reasons set forth below, we will not consider the exception herein.

Defendant answered, admitting employment at price stated, a slight injury, treatment by its nurse and its physician, but denies fracture, dislocation or any showing thereof by an X-ray photograph. Defendant then admits treatment by Dr. McIlhenny, but denies all allegations of permanent injury and recommendation for a plaster cast by Dr. Nelson and Dr. McIlhenny.

Further answering, respondent avers that plaintiff worked continuously for defendant at same task and for the same wages for all but seven and one-half days from the date of the injury until the day this suit was filed; that he never complained of being unable to perform the same work and never demanded compensation; that he left defendant's employment with a letter of recommendation almost a year after accident, because the work was almost finished and he had secured a new position.

There was judgment below for plaintiff as prayed for and defendant appealed suspensively.

While the appeal was pending in this court, the stenographer of the lower court died before he could transcribe his notes and the case was remanded for a new trial. The second hearing resulted in a like judgment for plaintiff and defendant has again appealed.

The plaintiff testifies in part as follows:

He only stayed away from work three or four days. He made full time and considerable overtime, as they told him the more he was on the foot the better; he worked nine hours a day after the accident and all possible extra time to get more money. There was no difference in his work at all after the accident; he got the same instructions under the same superintendent, and did not complain about the work being too heavy; tried to get all the extra work he could and never missed an opportunity to make overtime; he complained about having pain, but stayed on the job one year; kept up McIlhenny's treatment at home of hot and cold baths for foot all the time; bought two pairs of Dr. Spencer's correction shoes and wore them out, but didn't have price of $14.50 for a third pair.

When he left the American Can Company he left there to get another job with a letter of recommendation, but failed to get it because he couldn't work on a scaffold; did no work until December 15th, but filed suit three days after he quit American Can Company.

A millwright does contract jobs and does not have a regular job all the time; during the latter part of 1924, after first trial of this case, he worked for the Reynolds Dredging Company for a while, the first job lasting about six weeks; was with them on three different jobs, probably about nine months, doing rough carpenter work, not as hard as millwright work, but standing up; he left the Higgins Lumber Company because they sold out and fired him; he received seventy-five cents per hour, the same rate of pay he got with the American Can Company. He didn't carry a cane while working, and the day

of the second trial was first time he had used stick in streets since former trial; has done very little millwright work since he left can company; he had a job for them overhauling barges which was pretty heavy carpenter work and required him to stand most of the time.

He next was employed on a little carpenter job repairing floors, but sat down on this job. He worked for the Algiers Iron Works as ship carpenter two or three weeks at seventy-five cents per hour, but wasn't able to stand up on steel dock; on March 23rd, 1927, he went to work for the American Sugar Refinery, where he was working on April 20th, 1927, date of second trial, making sixty or sixty-one and one-half cents per hour. Mr. Beeson was the only official of the American Can Company he ever told he wanted compensation, but he told him he would have to have something to live on as he would not be able to work when that job was finished; if the job with defendant had not been finished he would have worked right along getting the same straight time and all overtime. His foot is no better. He has been without a job simply because he couldn't get work.

When asked:

"Q. Then when your petition says you are permanently totally disabled that is not right, is it?

"A. I don't claim I am permanently totally disabled."

His foot hurts him all the time, but more when at work; he has a wife and six children and must work; worked for Reynolds Dredging Company in January, February and part of March, 1925, then began again in latter part of May and worked until Christmas but missed probably half of the time on account of his foot, with can company's foreman's knowledge did less work while there after accident; still suffering pain in foot and unable to walk normally; hasn't earned half as much since he left can company. He admits he has four children working, who support themselves.

On rebuttal Barnes testified that he never had a serious injury to his right foot or leg other than the one he suffered at the American Can Company. That he never, prior to this accident, had either a fracture of that ankle or a badly set dislocation; only a sprain, and never so stated to Dr. Nelson; saw Mr. Cefalu, who was a labor foreman, about once a month while on Orleans job.

Gossett, a witness for plaintiff, testified that he was employed by the American Can Company and was working there about August 14th, 1923, as a millwright; knew Barnes, but didn't see accident; believed Barnes to be incapacitated after the alleged accident, but didn't know whether Barnes was actually suffering or not, but Barnes was limping and couldn't get around as well after accident; he wouldn't hire Barnes himself now for millwright work; he and Barnes only worked in the American Can Company a day or two before the accident; they worked in different rooms and not together; he didn't see what kind of work Barnes was doing; he did not know as a matter of fact whether Barnes could work as well as he could before the accident, but so believed; he didn't know how much or how little work Barnes did after the accident as he wasn't with him, though he saw him frequently.

Dr. Louis C. Spencer, offered as an expert on behalf of the plaintiffs, testified, on direct examination:

That Barnes complained of an injury about a year old and walked with a limp; had swelling around the right ankle on the outside of the foot, which

was painful to touch and sensitive to motion of the foot; he found no symptoms of infection caused by other maladies after more or less exhaustive research. In his opinion there was very little that could be done for Barnes other than to order a shoe which would give some support for his foot. He had not seen Barnes since the former trial until two or three weeks ago, and again the morning of this present trial, and from his observation and examination of Barnes he was of the opinion that Barnes' injury was incurable.

Barnes in his opinion is unable to perform the duties of a millwright, or any other duties which require the constant physical exertion or the lifting of heavy weights, or strenuous labor; Barnes was only capable of performing work of a sedentary nature, as he cannot be on his feet; Barnes had an atrophy of about one inch in circumference of the right calf which, in his opinion, is indicative of actual disability on that side.

On cross-examination he testified:

Barnes told him he had been treated by other doctors and he prescribed very little treatment as he looked upon the case as one which he couldn't help very much, but he ordered shoes with a rigid sole.

Barnes' foot could have become hurt in any number of different ways. That when he first saw Barnes on October 20th, 1924, he was very much inclined to believe that he had arthritis and he did everything to prove the presence of arthritis but failed and was then forced to fall back on the theory of injury; he accepted as true the statement Barnes gave him of how his foot became injured; Barnes, in his opinion, has been unable to do any heavy work since his injury, or working requiring him to stand on his feet; this it was his

opinion confirmed by his very recent examination.

*He would be very much surprised if the testimony in the case brought out that Barnes never stopped the work he had been doing and had continued to do the same work he had done since his injury and would think it unusual.*

On re-direct examination, he testified:

That Barnes never had a flat foot on the right side, but he has a flat foot on the left side; that at first when Barnes came to him he got the impression that Barnes was a malingerer and took all Barnes said with a grain of salt, but to the best of his knowledge and belief, because of atrophy, Barnes was telling the truth; it is possible Mr. Barnes might have strength of will sufficient to favor his leg constantly and thereby produce an atrophy, but that possibility is very remote.

On recross-examination, Dr. Spencer testified:

That Barnes did not have any dislocations or fractures that he could make out, and he thinks that the allegation in Barnes' petition to the effect that he had fractures and dislocations was a mistake.

On redirect examination Dr. Spencer testified:

That as a rule fractures leave evidence for many years, if not permanent, but dislocations might leave no traces; that the injury to Barnes was of the soft tissue and not of the bone.

Dr. Paul A. McIlhenny, expert medical witness on behalf of defendant and appellant, testified:

Barnes applied to him for treatment, in the early part of January, 1924; and gave the history of having fallen and sustained

an injury to his right foot, but, on examination, he found Barnes' right foot held in a position of a slight abduction, and, when standing on it, it assumed a position commonly termed "flat foot" in comparison with the left foot; though he also showed what is commonly known as "flat foot" on the left side.

His right foot showed a contraction of the muscles on the outer side of the ankle, commonly referred to as the abduction of the foot. His diagnosis was "traumatic flat foot", a condition probably produced by a blow producing condition of pain in the foot, in which the muscles held the foot in a position of abduction which was nature's effort at an attempt to splint the foot and hold it in a position less painful than any other position. He strapped the foot carefully and massaged it regularly. Barnes reported regularly for treatment for two months, during which time he invariably reported benefit. A corrective heel was ordered for use on the shoes he was wearing, which was higher on the inner edge than the outer edge and projected forward anywhere from one-quarter to three-quarters of an inch, forming a normal heel. At the end of that time he told Barnes he considered him normal and that he would have a perfectly useful foot: as a precaution he advised him to continue the hot and cold baths at home as previously recommended in order to increase the circulation in his foot. If he would do this he had no doubt he would have a perfect functional result and a perfectly useful foot; that he discharged Barnes because he considered him relieved of his condition; he was suffering no pain when he was discharged and at that time he considered him well able to return to and do work which required him to stand on his feet all day; that he was thunder-struck when he heard that Barnes had filed suit for damages.

In his opinion Barnes had flat feet prior to the injury as indicated by the condition of his left foot, and his condition would have been relieved as long as he used the corrective heels; the blow caused pain which produced a contraction of the muscles on the outer portion of the leg, which might have been caused by a sprain in the ankle.

The medical profession is not absolutely sure what produces and does not produce atrophy; that a lesion in the nerve can produce atrophy; inflammation above can produce atrophy below; disuse will produce it when produced by inflammation in a joint or simple disuse from keeping the parts still; he does not know what condition has developed in Barnes' leg since March, 1924, when he thought Barnes was able to go back to work.

On redirect examination he testified that an atrophy of one inch in a man's leg would not keep him from using that leg, and that it might make some appreciable difference in the use of the leg if the man had an occupation where he had to do a great deal of running or something of that sort. He found no dislocation or fracture in Barnes' foot and Barnes' petition is in error when he says that at the end of three or four months he advised him that continued treatment would produce no result as far as cure was concerned, and that the only cure would be by placing his foot in a plaster cast for six months or more; that he did not advise him in that respect at all. He did not advise Barnes as alleged in Barnes' petition, under Article 16, that he could do nothing further in the treatment of his injuries or that said injury was incurable unless he had his foot and ankle

placed in a plaster cast for six months or more. If treatment used did not produce results, plaster cast might be necessary after foot had been manipulated under an anaesthetic and contracted muscles strapped.

Dr. L. J. Menville, expert radiologist, witness for defendant, testified:

That he took an X-ray picture at the request of Dr. Nelson of Mr. Barnes' right ankle, which was produced and identified in court, and upon examination of same testified that it was "suspicious for old fractures of the external merleods, arthritis of the articulation", the merleods being the lower portion of the external part of the leg, and arthritis an inflammation in the joint structure between two bones; that the picture shows an arthritic infection; the result of trouble in the articulation between the two bones as evidenced in the X-ray picture by an increased density of the parts; that the picture and his report thereon was made November 21, 1923.

The suspicion of old fracture must have existed a long time prior to October 14, 1923.

He found no fracture in Barnes' foot; no suggestion of a dislocation, but if bone was properly put back in place, a dislocation would not show and the X-ray would not have shown evidence of injury to soft tissue after six weeks nor at any time after accident occurred.

If the suspicion of an old fracture was correct that he would say the fracture had existed for many, many months, probably eight to twelve months, or thirteen to fourteen months.

Dr. Nelson, who confirmed McIlhenny as to Barnes' ability to work after treatment, swears Barnes admitted to him a prior injury and he sent Barnes to Dr. McIlhenny because he was suspicious of his being a malingerer.

Beeson, superintendent of defendant company, testified that Barnes worked in the same way, at the same kind of work for same pay, after the accident until October 11th, 1924, making much overtime on Saturday afternoon, Sunday and holidays; that Barnes often complained of his foot, but never said work was too hard, and finally quit to take a new job with his letter of recommendation, because practically all of defendant's machinery had been installed and they had nothing more for him.

BURyant, manager, confirms Beeson.

Cefalu, a labor foreman of the Reynolds Dredging Company and of its successor, the Orleans Dredging Co., testified that plaintiff worked as a carpenter about eighteen months for their companies; that he often saw him on his trips down to the canal, putting cabins on barges and, if necessary, climbing ladders and standing on scaffolds, that he made seventy-five cents per hour, never complained, was a good steady worker, sometimes making overtime on Sundays. On cross-examination he testified that Barnes might have laid off two or three days at a time without his seeing him, as Campbell was Barnes' boss and he had charge of the negro labor.

It is thus seen that plaintiff has admitted that his allegation as "to permanent total disability to do work of any reasonable character" is totally unfounded and that there is little or no proof that his inability during the intervening three and one-half years to get work is due to his injury. On the contrary, he testifies that millwright work is more or less temporary and hard to secure at times.

Although he has doubtless suffered since the accident with his foot, the record bristles with evidence that for the greater part of the time since the accident he has been employed as advantageously as prior thereto, and there is no definite proof as to exact periods of idleness and non-employment, even if that non-employment were proved to have been caused by injury, a conclusion by no means proved by this record.

In the case of Eddie Wilson vs. Lyon Lumber Co., No. 9925, decided June 20th, 1927, and not yet reported, this court held that a partially disabled employee could recover only for the difference in wages earned by him before and after the accident, even if the injured party had worked with considerable pain under the mistaken advice of the defendant's doctors that such exertion would prove beneficial.

On this point see also:

Branchi vs. Board of Commissioners for the Port of New Orleans, 147 La. 281, 84 So. 657.

Chancellor vs. Continental Lumber Co., 6 La. App., p. 390.

Fuller vs. Robinson Construction Co., 5 La. App. 241.

Although this court, along with all the other appellate courts of the state, has invariably construed the compensation statute liberally, plaintiff must prove financial loss caused by the injury by a preponderance of the evidence, for the statute is only intended for financial compensation and not for general relief.

Sterns vs. Ohio Oil Co., 3 La. App. 81.

For above reasons the judgment below is reversed and it is now ordered that plaintiff's suit be dismissed at his cost.